Good morning. May it please the Court, my name is Amy Spicer and I am here. Can I just ask you, this is to some degree the Court's fault. We sent out a notice quite late yesterday just to ask that you be prepared to discuss three different cases. Did you get that? I did. Okay. Very good. I'm glad. Go ahead. I apologize. Go ahead. My name is Amy Spicer and I'm here representing Mr. Ocampo, the petitioner pro bono. How do you say his first name? Ignacio is his first name. Oh, I'm sorry, his second name. Ccayhuari, I believe. Okay. But I think I'll refer to him as Mr. Ocampo. I think that's probably the best. And if I could reserve two minutes for rebuttal, that would be great. Sure. In 2004, Mr. Ocampo and his wife, who is an American citizen, filed a Form I-130 with the government, seeking to establish the existence and bona fides of their marriage and asking for Mr. Ocampo to be given immediate relative status as a result. In late 2005, the INS interviewed the Ocampos as part of the I-130 process. And less than a month after the interview with the Ocampos, the INS approved the I-130. And the approval of the I-130 is by no means a guarantee. And, in fact, it establishes that the Ocampos marriage, it establishes by clear and convincing evidence that to the satisfaction of the Attorney General, the marriage was entered into in good faith, is a bona fide marriage, was not entered into for the purposes of procuring American citizenship for Mr. Ocampo, but that it is a legitimate marriage. Can I just, since we don't have a whole lot of time, let me just ask a quick question here. The facts of this case are one of the, these are hard cases for us because the human toll involved is enormous. But we're a court of law. And in this particular case, we've got our case, Ali Amin v. Mukasey, makes it very clear that an order of deportation and a removal order are one and the same. And in this case, the IJA denied Mr. Ocampo's application for asylum on September 25, 2000. The BIA affirmed the denial on November 12, 2002. And according to what we just talked about, on November 12, 2002, the order of removal became final, which triggered the 90-day time limit for him to file and reopen, which would have expired on February 10, 2009. He didn't file his motion to reopen until February 17, 2006, almost three years later. Under the circumstances, and also when you look at the Third Circuit's case of Obali and the Second Circuit's case of Thampa, how can we help you? So to address Ali Amin first. In Ali Amin, the issue of voluntary departure, which is present in Mr. Ocampo's case, was not a factor in Ali Amin. And therefore, the court didn't have an opportunity to address the impact of voluntary departure on the finality of an administrative decision. I think the other thing that's important about Ali Amin is that the motion to reopen filed in that case was to reopen the immigration judge or the IJA's decision. And it was under — it was pursuant to 8 CFR 1003.23. Here, the motion to reopen was filed to reopen the BIA's decision, and it was filed under 8 CFR 1003.2. The distinction, I think, is important here. When you're reopening the IJA's decision under 1003.23, the regulation states that a motion to reopen must be filed within 90 days of the entry of a final administrative order of removal, departure — sorry, removal, deportation or exclusion. Whereas when you're moving to reopen the BIA's determination under 1003.2, the — what you're moving to reopen is the final administrative decision. Perhaps this is splitting hairs, but I think the language is important. Certainly, the government, when it promulgated these regulations, knew what it was writing, and it could have used the same language. And, in fact, most of the remainder of those two regulations are substantially similar. Well, let's take — let's take — you know, you make an appealing argument, but didn't the Third Circuit expressly address that argument and reject it? So addressing FAPA and OBALI — and I think OBALI decided the issue first, and then FAPA sort of followed along. Both of those courts were troubled by the inherent tension between 8 U.S.C. 1001, which defines an order of deportation, and 8 CFR 1241, which is the regulation that talks about a final order of removal. And there the courts were looking at, well, do we have final jurisdiction? And in order to determine whether or not we have final jurisdiction, we need to determine whether or not this is a final order coming from the lower court, or in this case, the administrative agency. They were solely focused on that issue. And, in fact, they said that we're going to decline to enforce the regulation here because it's inconsistent with the determination of finality for the purpose of judicial review. And so there it's very clear that they're looking at the issue with sort of a narrow focus. Particularly in FAPA, the Court raised the issue sua sponte. The parties didn't raise the issue. There was no briefing on this issue of, well, what do you do with 1241.1F and the impact that it may have on the what that means in the context of a motion to reopen and voluntary departure and the problem you're reading and trying to read away these cases that in your client's situation he could have waited another 20 years and filed because the order is never final. There's no end to this? I think the thing that's important to remember here is that his voluntary departure period is still open. And it's open by virtue of this Court in large part because the DIA granted an additional 30 days to his voluntary departure. But then this Court has stayed the voluntary departure period, which, again, it's not a guarantee. And it is an indication that this Court reviewed the merits and said we think there is something to this case. My understanding is the Court does not grant motions to say voluntary departure lightly. And so the other thing is to the extent that the Court is concerned about opening the floodgates here and if you were to adopt the Petitioner's argument that you would  have to wait 30 days to reopen, I think that's a very, very narrow case of Petitioner's or Alien's that this rule would apply to. There was no time limit whatsoever on motions to reopen before 1996. And with the passage of new regulations in 2008, when you file a motion to reopen and you have been granted voluntary departure, your motion to reopen automatically terminates your period of voluntary departure. You wanted to save a little time, but I'd like you to think about this when you come back. In the event we feel that we're bound by the reasoning of these other cases, what remedy, what rights does your client have? Is he foreclosed? Is he done? What happens? Just think about that and we'll talk about it when you come back up. Sure. If I could just respond to that very briefly and then I will think about that. Okay. I think the thing that I find particularly frustrating about this case is that my understanding is that had the government not opposed to this motion to reopen in front of the BIA, the issue of timing would not have been a factor. And in fact, if the government had said, yes, we'll support you in this motion to reopen, we wouldn't be here. But because they chose to oppose on this sort of technicality, we're now in this position. That's like saying if Davy Crockett had not been in the Alamo, he'd still be alive. That's true. Thank you, Your Honor. Okay. We'll hear from the government. May it please the Court. My name is Kate Balaban and I'm representing the government in this case. And at issue is whether the Board abused its discretion in denying the Petitioner's motion to reopen where the motion was filed, in fact, three years after the statutorily imposed deadline. The statute is really clear, 1229AC7C1. It provides that a motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal. That's really the key, isn't it, what is final? Right. And Section 1101A47A provides that an order of removal means the order concluding that the alien is removable or ordering removal. Such orders become final upon, quote, a determination by the Board affirming such an order. And, Your Honor, I apologize. I didn't get your order, the Court's order, until this morning on the way over here to the courthouse. It's the Court's fault. But I had read Obale and I had read FAPA, and I think that the point is that there's absolutely no support in the case law anywhere for the Petitioner's reading of 8 CFR 1241.1. Sue, the people in the Petitioner's situation who have counted on the Board as reading this differently in the past and thought they could file a motion to reopen and it would be granted and it would be able to go forward, and suddenly they're being told, no, you had 90 days, it's final, you're out. I don't think it was ever the case in the past, with all due respect. There's always been, since enactment of the statute, a 90-day period. And the Court, we should recognize that there are exceptions, statutorily imposed exceptions, that Congress has provided where there's changed circumstances in the country. And there are the courts have imposed exceptions where there has been an allegation of ineffective assistance of counsel. And there's simply no precedent, there's no statutory authority for making an exception when relief becomes available or potentially available after the entry of the final order of removal, which is the circumstance here. These cases are. Kennedy. There are many instances where the Attorney General has exercised sua sponsa discretion in one of these I-130 kinds of cases. I mean, this Petitioner, of course, waited an extraordinarily long period of time. And as Judge Hogan indicated, by the argument of the Petitioner, they could wait for 20 years and there would be no difference. But you still have the human element of it. Do you know of any instances where the Attorney General has sua sponsa granted relief in this kind of a situation? I'm sure that I wouldn't want to say that there hasn't been an exercise, but in fact, these cases are quite common where we get instances where the alien is ordered removed, doesn't leave, pursues litigation, and then subsequently becomes eligible either for adjustment of status or cancellation of removal. And interestingly... We've seen those cases. Right. And it's not to say that it's fun to see them. In fact, the Petitioner in this case briefed this issue, and supplementarily to the Board, asking for they didn't use the term sua sponsa, but they pled exceptional circumstances. And the Board did not explicitly rule on that, but we read it as being an implied denial of exercise of discretion. And I think that, in fact, these cases happen quite a bit, that the alien becomes eligible for relief from removal after the final administrative order has been entered. Certainly, that would not mean that in this instance the Court, it would be wise to ignore the statutory scheme imposed by Congress, which is quite... At least for me, I just have to say how frustrating it is as a judge to carry out these draconian situations without relief concerning regulations that, if it were substituted as a generic or somonex, would put them out of business and would probably fund the national debt. I mean, these regulations are almost impenetrable to almost anybody. And that's all I'm saying, is that the statute is what the statute is. We are a court of law. We have to follow the statute. But this is rough justice. It really is. And it's very troubling. I understand... Do you agree that the statute is in conflict or the regulation, rather, is in conflict with the statute? No. I understand that Obali reads it that way, but we cite in our brief matter of A.M. in which the board states clearly that that regulation was meant for something quite different. It says it was meant to preserve 1241.1F, was meant to preserve the right of the alien to appeal to the board without wasting or using up his voluntary departure period, all of which is mooted by DADA and the regulations that the Attorney General has enacted after DADA. So now this doesn't become an issue because once the alien files either a petition for review or a motion to reopen, in other words, pursues further litigation, the voluntary departure grant is terminated automatically. So these – this is not an issue anymore. But what matter of A.M. states is that the reg that the Petitioner is relying on as providing that her – that his motion to reopen is not late doesn't, in fact, mean what they say it means at all. And as the courts recognized by looking to Obali and FAPA, the only courts who have looked at this issue have said that that's not what the reg means. So – and with respect to the draconian operation, I certainly understand that, Your Honor. The point is, though, that what Congress has said is that there has to be some date that a final order becomes certain, because otherwise the alien could pursue litigation strategies and also pursue marriage or any other grounds for – for future relief. And if you don't have a 90-day period, then there's no date certain upon which the alien is forced to do it. No, we – we get that. And, again, we're not the lawmakers. But there are occasionally truly meritorious situations. Many are not. Perhaps most are not. But occasionally, there are truly meritorious situations where, like Judge Huyck mentioned, where you have people that have been here a very long time – different situation, obviously, that he was talking about – but who have bona fide marriages, loving family situations, children, et cetera, et cetera. And all of a sudden, these people are swept up and there is no relief for them. That's my only point. You know, we follow the law. We do what the Congress says. We try to construe the regulations properly. But it is draconian. And with all due respect, I think that the relief here that Congress would point to is that the alien can – must leave and pursue adjustment of status from overseas, which is not convenient, certainly, but it's what Congress intends. But can she pursue the adjustment of status application? Absolutely. And, in fact, Petitioners states in their brief that, in their view, the alien has at no point overstayed voluntary departure, the grant in this instance. That's a really complicated question on which we haven't yet taken a position. And one of the reasons that we wouldn't take a position is because the Board hasn't taken a position and it would become, in fact, very relevant were the alien to pursue an adjustment of status application. Thank you. Okay. Thank you very much for your presentation. We have a brief rebuttal here. Your Honor, just to quickly address the government's position that no court has ever adopted this argument. In fact, this Court has looked at this argument and has said in – and I apologize, this wasn't in our brief, but it came out after briefing, and I recognize we should have filed a 28-J letter, but I just got on this case last week. But in Diouf v. Mukasey, which is at 542 F. 3rd. 1222, Ninth Circuit, 2008, authored by Your Honor. And at 1229, the Court actually says that it looks at whether or not Mr. Diouf's administrative period is – his administrative decision is final, and he – they rely on 1241.1 F for that very proposition. Addressing your question, Your Honor, I suppose that if the government would now stipulate to join Petitioner in a motion to reopen in front of the BIA, that perhaps the BIA would look at this without being concerned about the timeliness of the petition. Because I agree that with – as Judge Huggs said, that this is a petitioner who's been in the country for 22 years. He is a law-abiding member of the community. He is in a legitimate marriage, as this government has said. He supports his wife, who is very ill. He employs three people. He runs his own business. So this is the exact type of person that we should welcome and embrace as part of our country. To the extent that he leaves voluntarily, he's excluded from adjusting his status for 10 years. And that separates him from not only his business, but more importantly, from his wife. And so the result here is very, very harsh, as you have recognized. These are one of the small businesses that provide 65 percent of the jobs in the United States, right? That's correct. And we're supposedly trying to increase the number of jobs in the United States. Exactly. And his job has been flourishing. And, in fact, he now employs three people. And he's hoping to – if he is able to stay in the country, he hopes to employ more people, because he's in such great demand. Okay. Thank you for your presentation. Obviously, the government can't stipulate what you're talking about. But for what it's worth, we encourage the government to be mindful of the things we discussed today. Thank you. Thank you both for your presentation. The case of Ocampo v. Holder is submitted.
judges: Hogan, Hug, Smith M.